**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 21-2396**

―――――――――

TOWERS WATSON & CO., now known as WTW Delaware Holdings, LLC,

  Plaintiff – Appellee,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; FEDERAL INSURANCE COMPANY; U.S. SPECIALTY INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; LIBERTY INSURANCE UNDERWRITERS INC.; ALLIED WORLD NATIONAL ASSURANCE COMPANY; IRONSHORE INDEMNITY INC.,

  Defendants – Appellants.

―――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:20-cv-00810-AJT-JFA)

―――――――――

Argued:  March 8, 2023                     Decided:  May 9, 2023

―――――――――

Before AGEE and RUSHING, Circuit Judges, and Joseph DAWSON, III, United States District Judge for the District of South Carolina, sitting by designation.

―――――――――

Vacated and remanded by published opinion.  Judge Agee wrote the opinion, in which Judge Rushing and Judge Dawson joined.

―――――――――

**ARGUED:**  Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington, D.C., for Appellants.  Robin L. Cohen, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New

York, New York, for Appellee. **ON BRIEF:** Allen W. Burton, New York, New York, Joseph R. O'Connor, Los Angeles, California, Ephraim McDowell, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant Federal Insurance Company. Scott B. Schreiber, Arthur Luk, Ian S. Hoffman, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellant National Union Fire Insurance Company of Pittsburgh, Pa. William Leonard Mitchell, II, ECCLESTON & WOLF, PC, Fairfax, Virginia, for Appellants Liberty Insurance Underwriters, Inc. and Ironshore Indemnity Inc. Scott A. Schecter, KAUFMAN BORGEEST & RYAN LLP, Valhalla, New York, for Appellant Liberty Insurance Underwriters, Inc. William J. Brennan, KENNEDYS CMK LLP, New York, New York; Patrick James McDonald, CAMERON MCEVOY, PLLC, Fairfax, Virginia, for Appellant Allied World National Assurance Company. Cara Tseng Duffield, Matthew W. Beato, WILEY REIN, LLP, Washington, D.C., for Appellant U.S. Specialty Insurance Company. Thomas J. Judge, Jr., Charles Chotvacs, DYKEMA GOSSETT, PLLC, Washington, D.C., for Appellant Travelers Casualty and Surety Company of America. Adam S. Ziffer, Orrie A. Levy, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York, for Appellee.

---

AGEE, Circuit Judge:

In 2015, Towers Watson & Co. ("Towers Watson"), a Delaware company headquartered in Virginia, purchased directors and officers ("D&O") liability insurance coverage from several insurance companies, including National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") as the primary insurer. Following Towers Watson's merger with another company, Towers Watson shareholders filed several lawsuits against Towers Watson's chairman and CEO and others, alleging that the shareholders received below-market consideration for their shares in the merger. The litigation settled, and Towers Watson sought indemnity coverage from its insurers under the relevant D&O policies. The insurers refused the indemnity request, citing a so-called "bump-up" exclusion in the policies. This declaratory judgment action followed.

The district court sided with Towers Watson and held that the bump-up exclusion "does not unambiguously" preclude indemnity coverage for the underlying settlements. *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 1:20-cv-810 (AJT/JFA), 2021 WL 4555188, at *2 (E.D. Va. Oct. 5, 2021). In doing so, however, the court adopted an unduly narrow reading of the exclusion, finding ambiguity where none exists and ascribing specialized meanings to policy terms that the parties did not reasonably intend. We therefore vacate the district court's judgment and remand for further proceedings.

3

I.

A.

National Union, a Pennsylvania company with its principal place of business in New York, insured Towers Watson under a D&O policy for the 2015 policy year. Along with the National Union primary policy, Towers Watson purchased several layers of excess D&O liability coverage from the remaining Appellant-insurance companies (together with National Union, the "Insurers").[1] Those excess policies "follow form" to the primary policy, meaning that they incorporate the same terms. For convenience, we refer to these primary and excess policies collectively as the "Policy."

Under the Policy, the Insurers agreed to cover the "Loss of any Organization . . . arising from any Securities Claim made against such Organization for any Wrongful Act of such Organization," and the "Loss of an Organization that arises from any . . . Claim . . . made against any Insured Person . . . for any Wrongful Act of such Insured Person." J.A. 62.[2] "Loss" is a defined term that generally includes "damages, settlements, judgments," and defense costs. J.A. 82.

---

[1] Each of these excess insurers is incorporated and headquartered in states other than Delaware and Virginia.

[2] The term "Organization" includes the "Named Entity," J.A. 83, which is defined as "Towers Watson & Co.," J.A. 57, and the term "Insured Person" includes any "Executive" or "Employee" of Towers Watson, J.A. 82. A "Securities Claim" includes any "Claim" alleging the violation of a "federal, state, local or foreign regulation, rule or statute regulating securities" brought against Towers Watson or its executives or employees related to a securities interest in Towers Watson, as well as a "Derivative Suit." J.A. 86.

As stated above, the Policy includes a bump-up exclusion, which generally bars coverage for losses stemming from judgments or settlements in connection with claims against the insured seeking an increase, or "bump up," in the consideration paid for a security. In relevant part, the bump-up exclusion provides:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased.

J.A. 83.

This appeal turns on the proper interpretation of this exclusion. Before undertaking that analysis, however, we first provide relevant context.

## B.

In 2015, Towers Watson and Ireland-based Willis Group Holdings plc ("Willis") executed a "Merger Agreement" under Delaware law. That agreement, which was approved by a majority of Towers Watson's shareholders, involved a reverse triangular merger in which a newly created Delaware corporation and wholly owned subsidiary of Willis, Citadel Merger Sub, Inc. ("Citadel"), merged into Towers Watson and disappeared, leaving Towers Watson as the surviving entity. Immediately following the merger, all Towers Watson shares were canceled and delisted from the NASDAQ. In exchange, Towers Watson shareholders received the right to 2.649 shares of Willis stock for each

5

canceled Towers Watson share.[3] As a result of this conversion rate, the now-former Towers Watson shareholders collectively acquired 49.9 percent ownership of Willis.[4] The surviving Towers Watson entity then issued newly created shares to Willis, giving Willis ownership of "the only outstanding shares" of Towers Watson stock. J.A. 758. In the end, therefore, the implemented Merger Agreement resulted in Towers Watson, with all its pre-merger assets, becoming a wholly owned subsidiary of Willis.

The Willis-Towers Watson reverse triangular merger is not the only merger relevant to this appeal, however. On the same day that the above-described merger under the Merger Agreement was consummated, a subsequent, legally distinct merger involving Towers Watson occurred: Towers Watson merged into another wholly owned subsidiary of Willis, WTW Delaware Holdings LLC. As a result of *that* merger, Towers Watson ceased to exist.[5]

Over the next few years, former Towers Watson shareholders filed separate class actions against various parties involved in the merger, including Towers Watson's former

---

[3] Towers Watson shareholders also received a pre-merger special dividend.

[4] Following the merger, the "combined" Willis parent company was renamed Willis Towers Watson plc. To avoid any confusion, however, we continue to refer to the parent company as Willis.

[5] This second merger involving Towers Watson and WTW Delaware Holdings was referenced in the Towers Watson proxy statement issued to shareholders in connection with the Merger Agreement, but it was not a merger covered by the Merger Agreement itself. *See* J.A. 633 (Towers Watson proxy statement noting in the "Post-Closing Matters" section that "Willis and Towers Watson also plan to combine Towers Watson with an existing U.S. subsidiary of Willis, with the existing U.S. subsidiary of Willis surviving, through a merger that will be effected immediately following the Merger").

6

chairman and CEO John Haley. One action was filed in Virginia federal district court and two others were filed and later consolidated in the Delaware Court of Chancery.[6] These actions, which asserted federal-securities-law claims and Delaware-state-law claims, respectively, both stemmed from allegations that Haley negotiated the Merger Agreement under an undisclosed conflict of interest: Haley would receive a compensation package worth up to $165 million if the deal closed. And because of this alleged conflict, Haley purportedly agreed to a below-market valuation of Towers Watson shares to ensure the merger's success.

Both shareholder actions ultimately settled for a total of $90 million—$75 million in the Virginia action and $15 million in the consolidated Delaware action.

## C.

While the Virginia and Delaware actions were pending, Towers Watson[7] sought coverage under the Policy. The Insurers funded Towers Watson's legal defense but denied indemnity coverage for any resulting judgment or settlement based on the bump-up exclusion. According to the insurers, the Virginia and Delaware actions sought increased consideration for Towers Watson shares, thereby triggering the Policy's bump-up exclusion. In response, Towers Watson filed this declaratory judgment action in Virginia

---

[6] Among other defendants, the Delaware action named several (if not all) members of Towers Watson's former board of directors, including Haley. In the Virginia action, however, the only former Towers Watson's director named as a defendant was Haley.

[7] Although Towers Watson's legal existence terminated following the company's merger into WTW Delaware Holdings, we adopt the parties' convention of continuing to refer to Towers Watson as though it maintained its separate existence post-merger.

7

federal district court, seeking a declaration that the bump-up exclusion would not foreclose indemnity coverage.

Shortly after filing this suit, Towers Watson moved for partial summary judgment, arguing that the bump-up exclusion was inapplicable for three reasons. First, Towers Watson argued that the effected Merger Agreement did not result in "the acquisition of all or substantially all the ownership interest" of Towers Watson as required under the bump-up exclusion because the transaction involved a merger of equals, not an acquisition. Second, Towers Watson contended that even if the transaction was an acquisition, it wasn't an acquisition of "an entity" as required under the exclusion because the phrase "an entity" should not encompass Towers Watson, which the Policy specifically defines as the "Insured," the "Named Entity," or the "Organization." And third, Towers Watson posited that even if its first two arguments failed, the specific allegations and theories of liability and damages in the underlying shareholder litigation make clear that the settlements in those cases do not "represent the amount by which such price or consideration is effectively increased" as required under the bump-up exclusion.

The district court agreed with Towers Watson on the first ground—that the consummated Merger Agreement did not involve an "acquisition" within the meaning of the bump-up exclusion—and granted Towers Watson's partial summary judgment motion without addressing the other two arguments. The court arrived at this conclusion based on its view of the Policy's language, the structure of the merger, and Delaware corporate law.

The Insurers timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

8

II.

We review de novo the district court's summary judgment award, "applying the same standards as the district court." *DENC, LLC v. Phila. Indem. Ins. Co.*, 32 F.4th 38, 46 (4th Cir. 2022). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

Because this appeal invokes our diversity jurisdiction, we must apply the forum state's choice-of-law rules to determine the governing substantive law. *See Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 92 (4th Cir. 2003). In Virginia, the law of the place where a contract is formed controls the contract's interpretation. *See Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). The parties agree that the Policy was formed in Virginia, so Virginia law governs its interpretation.

In Virginia, "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729 (Va. 1989).

If policy language is ambiguous, that ambiguity must be resolved against the policy's drafter, which "is almost always the insurer," *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019), as is the case here. This *contra proferentem* rule applies with particular force in cases involving the construction of coverage exclusions, *see Seals*

9

*v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009), where the insurer has the burden to prove that an exclusion applies, *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012).

However, the Supreme Court of Virginia has "caution[ed]" courts to "resist[]" the "temptation" to "give up quickly on the search for a plain meaning by resorting to the truism that a great many words—viewed in isolation—have alternative, and sometimes quite different, dictionary meanings." *Erie Ins. Exch.*, 822 S.E.2d at 355. Otherwise, "the contra proferentem thumb-on-the-scale would apply to nearly every interpretation of nearly every insurance policy." *Id.* For that reason, the Virginia high court has repeatedly instructed that policy language is truly ambiguous only where the "competing interpretations . . . are 'equally possible' given the text and context of the disputed provision." *Id.* at 356 (citation omitted).

In its effort to apply these principles, the district court found that "the Bump-Up Exclusion's reference to 'the acquisition' does not unambiguously apply to the Merger" because "there is a reasonable, narrow reading of the Bump-Up Exclusion that excludes the Merger" and thus results in coverage for the insured. *Towers Watson & Co.*, 2021 WL 4555188, at *13 & n.29. Accordingly, the district court determined that the bump-up exclusion does not apply. We disagree.

Our analysis naturally begins with the relevant exclusionary language:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for *the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity* is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased.

10

J.A. 83 (emphasis added).

As the district court correctly noted, the term "acquisition" "is not defined in the policy, [so] the term must be given its ordinary and accepted meaning." *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 330 (Va. 2000). To ascertain that ordinary meaning, we follow Virginia courts' established practice of looking to the term's dictionary definition. *See, e.g.*, *id.* (consulting a dictionary for the plain meaning of an undefined term in an insurance policy); *see also CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 158 (4th Cir. 2009) (following the same practice when interpreting an undefined term in a Virginia insurance policy). In doing so, we remain mindful of the context in which the term appears in the Policy. *See Erie Ins. Exch.*, 822 S.E.2d at 355 ("The plain meaning of a word depends not merely on semantics and syntax but also on the holistic context of the word within the instrument.").

The term "acquisition" is defined as "the act or action of acquiring." Webster's Third New International Dictionary 19 (2002). The word "acquire," in turn, means "to come into possession [or] control . . . of often by some uncertain or unspecified means." *Id.* at 18; *see also Acquisition*, Black's Law Dictionary (11th ed. 2019) (defining "acquisition," in relevant part, as "[t]he gaining of possession or control over something," e.g., the "acquisition of the target company's assets").

Given this plain and ordinary meaning, our limited and straightforward inquiry is whether, as a result of the executed Merger Agreement, another entity gained "possession"

11

or "control" "of all or substantially all the ownership interest in or assets of" Towers Watson.[8] We find that the answer is clearly yes.

As noted earlier, under the Merger Agreement, Willis-subsidiary Citadel merged into Towers Watson, with Towers Watson as the entity surviving the transaction. The Towers Watson shares were then canceled and delisted, and newly created Towers Watson shares were issued solely to Willis. These events collectively resulted in Towers Watson, with all its pre-merger assets, becoming a wholly owned subsidiary of Willis. *See* J.A. 757–58 (Merger Agreement stating that "following the Merger, the Surviving Corporation [Towers Watson] will . . . be a wholly-owned subsidiary of Parent [Willis]" and that "the Surviving Corporation [Towers Watson] shall issue an equivalent number of fully paid shares of common stock, . . . all of which shares shall be held by Parent [Willis], and which shall constitute the only outstanding shares of common stock of the Surviving Corporation [Towers Watson]"). We think it clear that an ordinary person would understand that, through this reverse triangular merger, Willis obtained "possession" or "control" of—i.e.,

---

[8] For purposes of this appeal, we must assume, but do not decide, that Towers Watson qualifies as "an entity" under the bump-up exclusion. As previously indicated, Towers Watson separately argued to the district court—and now separately argues on appeal—that it should not be classified as "an entity" within the meaning of the bump-up exclusion. If accepted, this alternative argument would form an independent basis for the exclusion's inapplicability. The district court found it unnecessary to reach this alternative argument. Given our holding today, we too decline to address the issue—though we question its validity—and instead reserve it for the district court's consideration in the first instance on remand.

12

*acquired*—not just all the equity ownership interest in Towers Watson, but also all of Towers Watson's assets.[9]

In concluding otherwise, the district court relied heavily on an unpublished Delaware Superior Court decision to hold that the phrase "the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity" connotes a "takeover acquisition" under Delaware corporate law, which treats mergers as legally distinct transactions. *Towers Watson & Co.*, 2021 WL 4555188, at \*12 (citing *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, C.A. No. N18C-09-210, 2021 WL 347015 (Del. Super. Ct. Feb. 2, 2021)). A takeover acquisition, the district court mused, involves "the takeover of one company by another, with both companies surviving the transaction," whereas a merger "contemplates the combination of two companies into

---

[9] This conclusion is reinforced by the fact that courts and corporate-law treatises alike commonly characterize reverse triangular mergers as acquisitions given the practical end result—the "target" company becomes a subsidiary of the "acquiring" company, mirroring an acquisition rather than a conventional merger. *See, e.g.*, *In re C-T of Va., Inc.*, 958 F.2d 606, 607–08 (4th Cir. 1992) (stating that a "leveraged *acquisition*" was "structured . . . in the form of a reverse triangular merger" (emphasis added)); *Disk Authoring Techs. LLC v. Corel Corp.*, 122 F. Supp. 3d 98, 112 (S.D.N.Y. 2015) (explaining that an "*[a]cquisition* was structured as a reverse triangular merger" (emphasis added)); *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 5 (Del. 2020) (stating that a company "*acquired*" another "through a reverse triangular merger" (emphasis added)); *Lewis v. Ward*, No. Civ.A. 15255, 2003 WL 22461894, at \*4 n.18 (Del. Ch. Oct. 29, 2003) (noting the advantages of reverse triangular mergers and calling them "the preferred method of *acquisition* for a wide range of transactions" (emphasis added)); R. Franklin Balotti et al., Delaware Law of Corporations and Business Organizations § 9.5 (4th ed. 2023) ("[R]everse triangular mergers are acquisition techniques[.]"); Byron E. Fox & Eleanor M. Fox, Corporate Acquisitions and Mergers § 3.03 (2023) ("In a reverse triangular merger, the *acquirer's* controlled subsidiary merges into the target (*acquired* company)[.]" (emphases added)).

13

a single entity, with shared ownership by the shareholders of both participating entities." *Id.* at *9.

Based on that understanding, the district court held that an "acquisition" within the meaning of the bump-up exclusion did not occur here. Rather, "the Merger, as planned and completed, involved Towers Watsons' [sic] merging into another Willis subsidiary [WTW Delaware Holdings] without being the surviving entity." *Id.* at *10. In reaching that conclusion, the district court determined that the initial reverse triangular merger involving Towers Watson and Citadel was essentially irrelevant. To focus on that initial merger, the court reasoned, would improperly "'freeze[] the frame' on a short-lived transitional event that did not involve any of the [Towers Watson] shares held by [Towers Watson] shareholders, the effect of which was quickly eliminated through a subsequent implementing step in completing the Merger, as planned." *Id.* The district court continued:

> In that regard, Willis never actually "acquired" any of the stock of the former Towers Watson Shareholders. Rather, Towers Watson and Willis cancelled and delisted all their outstanding publicly traded shares and the "merger consideration" [Towers Watson] shareholders received for their cancelled shares was a Certificate from Towers Watson that entitled them to 2.6490 shares of newly issued Willis shares, without any acquisition by Willis of any formerly owned, now cancelled Towers Watson shares. Upon completion of the Merger, the former [Towers Watson] shareholders, far from being eliminated as owners, owned 49.9% of the newly constituted Willis, without Willis having acquired any of the cancelled Towers Watson shares previously owned by [Towers Watson] shareholders and without Towers Watson's continued existence. The only point in time when Willis arguably "received 100% of the 'only outstanding shares' of [Towers Watson's] common stock" was when, after Towers Watson cancelled its common stock then held by its shareholders, Towers Watson issued new shares never held by any [Towers Watson] shareholder, "to be held" by Willis, before quickly being merged into a Willis subsidiary and disappearing. Under these circumstances, the Merger was hardly comparable to the straightforward takeover of one company by another suggested by the

14

Bump-Up Exclusion and therefore is reasonably viewed as something other than "the acquisition" referenced in the Bump-Up Exclusion.

*Id.*

We find the district court's analysis flawed in several respects.

To begin, nothing in the bump-up exclusion stipulates, or even hints, that the term "acquisition" was intended to refer only to a particular form of acquisition—i.e., a takeover—under Delaware law. Nor can such an intent be gleaned from any other provision of the Policy, which is governed not by Delaware law but by Virginia law.[10] We will not assign a specialized meaning to a contract term absent some indication that the parties intended to do so. *See PMA Cap. Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006) ("The contract is construed as written, without adding terms that were not included by the parties."); *Worsham v. Worsham*, 867 S.E.2d 63, 71–72 (Va. Ct. App. 2022) (stating that contract terms must be accorded their ordinary meaning unless "it is manifest from the instrument itself that other definitions are intended" (cleaned up)). The general principle that exclusions must be narrowly construed assuredly does not authorize us to take such a drastic step. Far from it. Courts are not at liberty to rewrite otherwise plain and unambiguous policy language in order to arrive at an insured-favorable outcome. *See Va. Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009) ("When a disputed policy term is unambiguous, we apply its plain meaning as written."); *see also Gov't Emps.*

---

[10] Although the Merger Agreement between Towers Watson and Willis was governed by Delaware corporate law, the Policy we are called to interpret in this appeal is undisputedly governed by Virginia law. And, again, nothing in the Policy purports to apply Delaware corporate law to the bump-up exclusion's interpretation.

15

*Ins. Co. v. Moore*, 580 S.E.2d 823, 828–29 (Va. 2003) (reversing the trial court's judgment for the insured where an exclusionary clause unambiguously excluded coverage).

Here, the bump-up exclusion refers to "the acquisition of all or substantially all the ownership interest in or assets of an entity." Not further defined in the Policy, the term "acquisition" must be given its ordinary meaning, which is to gain "possession" or "control" of something. Thus, the bump-up exclusion's "acquisition" requirement is satisfied where another entity secures "possession" or "control" "of all or substantially all the ownership interest in or assets of" Towers Watson. That is precisely what happened here as a result of the Willis-Towers Watson reverse triangular merger: Willis gained total possession and control of all ownership interest in Towers Watson, and with it all of Towers Watson's assets.

In that respect, we also disagree with the district court that this initial reverse triangular merger involving Towers Watson and Citadel was merely a "short-lived transitional event" with no legal significance. *Towers Watson & Co.*, 2021 WL 4555188, at \*10. To the contrary, that legally distinct merger—and the sole merger contemplated by the Merger Agreement—carried with it distinct legal consequences. Not only was this initial merger the focus of the underlying shareholder litigation, but it was also the very transaction that resulted in Towers Watson becoming a wholly owned subsidiary of Willis, giving Willis total control of Towers Watson and its assets. The discrete legal events that subsequently transpired, namely, Towers Watson's merging into another Willis subsidiary and disappearing, are beside the point.

16

Nor do we think it material that "Willis never actually 'acquired' any of the stock of the former Towers Watson Shareholders" but instead received newly created shares "never held by any [Towers Watson] shareholder." *Towers Watson & Co.*, 2021 WL 4555188, at *10. The bump-up exclusion is not triggered by the acquisition of any particular shares; it is triggered by the acquisition of "all or substantially all the ownership interest in or assets of an entity." J.A. 83. Thus, what matters is whether Willis obtained possession or control of all or substantially all of Towers Watson's equity or assets. And as detailed above, that is just what happened here.[11]

\* \* \* \*

Under Virginia law, it will not do to merely identify any conceivable basis to hold that an insurance-coverage exclusion does not apply before stripping the exclusion of all force. Rather, the language of the exclusion must reasonably lend itself to an "equally possible" interpretation precluding the exclusion's applicability. Here, however, the district court's chosen interpretation, which disregarded the Policy's plain language and inserted terms not included by the parties, cannot be characterized as one of two "equally possible" constructions. Therefore, we must vacate the district court's judgment.

---

[11] Towers Watson also stresses the point that its former shareholders collectively owned 49.9 percent of Willis following the initial merger, arguing that such fact precludes a finding that all or substantially all of Towers Watson's equity or assets were acquired by another entity. But the post-merger ownership makeup of *Willis* is irrelevant to the question whether there was an acquisition of all or substantially all the ownership interest in or assets of *Towers Watson*. And as we've already explained, the answer to that all-important question is plainly yes.

17

To be clear, our narrow holding does not resolve the ultimate question whether the bump-up exclusion bars indemnity coverage to Towers Watson for the underlying settlements. Towers Watson has raised two independent bases for the exclusion's facial inapplicability—that Towers Watson doesn't constitute "an entity" and that the underlying settlements don't represent an effective increase in consideration for the original Towers Watson shares. The district court declined to address those arguments below. We believe the proper course is to remand to the district court for resolution of those issues in the first instance, assuming of course that Towers Watson elects to raise them again.

IV.

For these reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

18