REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2122

September Term, 2012

CASH & CARRY AMERICA, INC.

v.

ROOF SOLUTIONS, INC., ET AL.

Eyler, Deborah S.,
Woodward,
Thieme, Raymond G., Jr.
        (Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah S., J.

Filed: June 30, 2015

The primary question in this case is whether a roofing contractor who performs work on a structure owes a duty of care in tort to a third party owner of personal property inside the structure. The answer is yes, although there are limits on the type of property damage encompassed by this duty of care, as we shall discuss.

Cash & Carry America, Inc. ("CCA"), the appellant, is a business owned in part by Merle Coe, who is its Chief Executive Officer. In the Circuit Court for Montgomery County, CCA sued Diogo Depaula and Roof Solutions, Inc. ("Roof Solutions"), the appellees, alleging that their negligence in carrying out roof replacement work on a townhouse owned by Coe caused the roof of the townhouse to catch fire, which damaged property belonging to CCA that was inside the townhouse. The court granted summary judgment in favor of Depaula and Roof Solutions, a ruling CCA challenges on appeal.[1]  We shall reverse the judgment and remand for further proceedings.

## FACTS AND PROCEEDINGS

Coe owns and lives in a townhouse in Washington, D.C.  In 2010, he contacted Roof Solutions about replacing the townhouse's roof, which was old.  Artem Chanturiya, a roofing specialist with that company, met with Coe at the townhouse. According to Coe, the two

---

[1]The particular questions posed by CCA are:

 I.     In Maryland does the economic loss doctrine shield a contractor from tort liability to a third party where the contractor damaged the third party's personal property located where the tort occurred, but ancillary to the work being performed?

 II.    Was there a sufficient factual basis for a reasonable trier of fact to conclude that Appellee Roof Solutions, Inc. caused the fire that damaged the Appellant's property?

walked through the townhouse, and in doing so saw two computers sitting on the floor of an upstairs bedroom he used as an office. Coe told Chanturiya that the computers belonged to CCA, a company he ran, and that the office and property of CCA had been moved into his townhouse.

On September 13, 2010, Coe signed a roof replacement contract with Roof Solutions and paid a deposit. Pursuant to a subcontracting agreement in force since 2008, Roof Solutions hired Depaula to perform the roof replacement work.

The work started on September 22, 2010, and still was in progress on September 24, 2010. That evening, the last worker left the townhouse at 7:30 p.m. At 9:34 p.m., a neighbor called the District of Columbia Fire Department ("DCFD") to report smoke on the roof of the townhouse. (Coe was not at home.) Fire Department personnel quickly arrived, spotted a fire burning on the roof, and put it out. By 10:00 p.m., DCFD investigators Rodney L. Taylor and Keith Byrd had started their origin and cause ("O&C") investigation of the fire. In their report of findings, Taylor opined that the "roofers were using a torch to heat tar paper. The flame/heat from the torch ignited the structural members of the roof." He classified the fire as "accidental."

The day after the fire, Chanturiya and Coe again walked through the townhouse. According to Chanturiya, Coe pointed out some computers on the floor in the second story bedroom he used as an office. They were sitting in water that had come into the townhouse when the DCFD was putting out the fire. Coe told Chanturiya the computers were for a

2

business he was trying to start. According to Chanturiya, this was the first he had heard about Coe's business. Coe said he was unsure about the future of the business because he did not know if the hard drives on the computers could be salvaged. Chanturiya took photographs of the computers.

Coe made a claim with State Farm Insurance Company ("State Farm"), his homeowners insurance carrier, and State Farm hired Firemark, Inc., to perform an O&C investigation. Ward Caddington, an investigator with Firemark, performed the work and wrote a report, in which he concluded that "[t]he fire was started as a result of heat from the roofer's torch ignited [sic] wooden framework of the roof at the area of the office which was located on the second floor."

In his insurance claim, Coe sought to recover, among other things, $298,743.20 in personal property losses that may have included losses he alleged CCA had sustained as a result of the fire. CCA is a Delaware corporation that, according to Coe, is in the business of developing computer cash register systems. The company is owned by Coe and one Thomas Snyder. Its principal place of business is at Snyder's house in Bethesda. In the early 2000's, CCA built two computers that were prototype cash registers. The computers use "CRISP$^{TM}$" technology software, which CCA developed. Until 2005, the computers were kept in a storage facility in Capitol Heights, Maryland. In 2005, they were moved to Florida. Eventually, they were moved to Coe's townhouse in D.C.

3

On September 6, 2011, Coe and CCA sued Depaula and Roof Solutions for negligence. They alleged that Depaula had breached the standard of care in performing the roof replacement work, thereby causing the roof to catch fire; and that Roof Solutions was vicariously liable for Depaula's negligence. They also alleged that Roof Solutions had negligently hired, retained, and supervised Depaula as a roofing subcontractor.

As relevant here, in Count Three,[2] CCA averred that the fire, and more particularly the water used to put it out, had damaged the interior of the townhouse and items inside it, including CCA's computers. It sought compensatory damages for:

- the cost of repairing and/or replacing components in CCA's computers.
- the cost of repairing and/or replacing the software in CCA's computers.
- the value of the time expended by Coe, as CCA's CEO, and other principals of CCA in connection with repairing and/or replacing the computer components and the software.
- the cost of disruption and delay in implementing CCA's business plan.
- the loss of anticipated revenues from implementation of CCA's business plan.

CCA identified Taylor and Byrd, with the DCFD, and Caddington, with Firemark, as expert witnesses. Depaula identified Michael Tracey, a structural engineer with CED Technologies, as an expert witness.[3]

---

[2]Counts One and Two were brought by Coe against only Roof Solutions and Depaula. State Farm brought a subrogation action against Depaula and Roof Solutions. The cases were consolidated and discovery proceeded. On September 28, 2012, those counts and State Farm's subrogation action were settled and voluntarily dismissed with prejudice, along with cross-claims arising from them.

[3]Roof Solutions initially identified Keith Morris, an O&C investigator with Global Forensics Investigations, as an expert witness. It later decided to use Morris only as a

(continued...)

4

On October 18, 2012, Depaula filed a motion for summary judgment and request for hearing. In an attached affidavit he attested that, until Coe and CCA filed suit, he did not know that CCA existed and knew nothing about any computers belonging to CCA being inside Coe's townhouse. He also attached Coe's deposition testimony that the damaged computers were of a 2000 to 2004 vintage and the damaged software had not been run since 2004.[4] He argued that he did not owe a duty of care in tort to CCA, and that CCA was not a third party beneficiary of his subcontracting agreement with Roof Solutions. He also argued that CCA's claims were barred by the "economic loss doctrine."

CCA filed an opposition. It furnished an affidavit by Coe and additional portions of his deposition; the Statement of Loss Coe filed with State Farm; and eight photographs of the damaged computers. In his affidavit, Coe attested that Snyder and Donald Bosic, Executive Vice President and Director of CCA, "were aware that the contents of the [CCA] office on Montgomery Avenue in Bethesda, Maryland was moved into" Coe's townhouse. CCA argued that there were genuine disputes of material fact that precluded the grant of summary judgment; Depaula owed it a duty of care in tort; and, specifically, Depaula owed CCA a duty to perform the roofing work with requisite care, so as to avoid damaging CCA's

[3](...continued)
consulting, non-testifying, expert.

[4]In addition, Depaula attached excerpts of Chanturiya's deposition; certain interrogatory answers by CCA; the contract between Roof Solutions and Coe; his subcontracting agreement with Roof Solutions; a Roof Solutions Work Order pertaining to Coe's townhouse; and a Roof Solutions Work Order Ticket, also pertaining the townhouse.

property inside the townhouse. CCA argued that the damage to its property was not a purely economic loss.

On October 25, 2012, Roof Solutions also filed a motion for summary judgment. It relied upon the documents furnished by the other parties, and some additional documents. It argued that it did not owe a duty of care in tort to CCA; CCA was not a third-party beneficiary of its contract with Coe; if it owed any duty of care to CCA, it did not breach it and no damages were sustained; if any damages were sustained, they were not proximately caused by any breach of duty on its part; and there was no evidence to support the claim that it negligently selected, hired, or supervised Depaula.

CCA filed an opposition, relying upon evidence already in the summary judgment record and additional documents, including the DCFD O&C investigation report; an excerpt from the deposition of Michael Tracey, in which he opined that Roof Solutions had breached the standard of care by using a substrate material for the replacement roof that was a quarter inch less thick than required (although he did not opine that that had caused or contributed to the fire); an excerpt from the deposition of Russell Deighton, President of Roof Solutions; and portions of the report prepared by Caddington, of Firemark, for State Farm. It argued that there were numerous disputes of material fact that precluded summary judgment; Roof Solutions owed it a duty of care in tort; and Roof Solutions breached that duty by choosing the wrong materials for the roof, selecting an incompetent subcontractor, failing to

adequately supervise the subcontractor's work, and allowing the subcontractor to use a torch on the roof.

The summary judgment hearing took place on November 30, 2012. After hearing argument of counsel, the court granted summary judgment in favor of Roof Solutions and Depaula on CCA's negligence claim. It explained:

> The primary issue . . . is whether or not the defendants have a legal duty to the plaintiff in this case. . . . [CCA] is a corporation which is incorporated in Delaware, its corporate address is . . . in Bethesda. The plaintiff's corporate records do not identify Mr. Coe's . . . residence as a business address, and the records and documents and photographs do not mention or depict any software computer equipment at Mr. Coe's residence prior to the fire. The contract that was entered into itself is with Mr. Coe. Mr. Coe paid the defendants Roof Solutions, from his personal account, there's no evidence that Mr. Coe consulted with [CCA] about replacing the roof. In addition, the work order . . . reflects that Mr. Coe is the client for whom the work is being performed, not [CCA]. I understand what plaintiff is saying with respect to the applicable law and whether or not there's an extension of duty that should be applied under the facts of this case. And given the state of the law, the facts of this case, I do agree that to allow this claim to proceed would be essentially the equivalent of allowing anyone who had property at the plaintiff's residence at the time of the fire to make the claim for damages, and would result in a slippery slope that I'm just not prepared to recognize, given the state of the law at this time. In addition, given the pleadings that have been submitted, I'm also going to grant summary judgment on the issue of causation.

The court entered orders memorializing its rulings. Thereafter, CCA noted a timely appeal.

We shall include additional facts as necessary to our discussion of the issues.

## STANDARD OF REVIEW

7

A circuit court may grant a motion for summary judgment if it finds that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Montgomery Cnty. v. Soleimanzadeh*, 436 Md. 377, 397 (2013). Both these issues are questions of law, and therefore our standard of review is *de novo*. *Myers v. Kayhoe*, 391 Md. 188, 203 (2006). In assessing whether the circuit court erred in deciding whether there was a genuine dispute of material fact, we must keep in mind that a fact only is material when its admission will make a difference in the outcome of the case. *King v. Bankerd*, 303 Md. 98, 111 (1985).

## DISCUSSION

## I.

### Duty of Care in Tort

The court granted summary judgment to Roof Solutions and Depaula on their duty of care argument upon a finding that there was no evidence in the summary judgment record that computer equipment was inside the townhouse when the roof replacement work was being done and upon a finding that Depaula, as a subcontractor performing work on Coe's townhouse roof, did not owe a duty of care in tort to CCA as a third-party owner of personal property inside the townhouse. CCA argues that the court's duty of care ruling was legally incorrect because 1) there in fact was evidence in the summary judgment record that computer equipment was in the townhouse when the roofing work was being done, and 2) under the circumstances of this case, principles of foreseeability favor Depaula's owing a

8

duty of care to CCA to protect its property in the townhouse from harm. Although CCA does not make a separate argument as to Roof Solutions, it is clear that CCA's primary theory of prosecution against Roof Solutions is that it is vicariously liable for Depaula's negligence.

For reasons that will become evident in our discussion, it is logical to address these arguments in inverse order.

**(A)**

To make out a cause of action for negligence, a plaintiff must prove that the defendant owed "him (or to a class of which he is a part)" a duty of care; that the duty was breached; that the breach was a proximate cause of the harm suffered; and damages. *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 531 (1986). Thus, "[d]uty is a foundational element in a claim of negligence." *Pace v. State*, 425 Md. 145, 155 (2012). Whether a duty of care exists is a pure question of law for the circuit court to decide in the first instance, and for this Court to review *de novo*. *See Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999) (existence *vel non* of a legal duty of care in tort is a question of law subject to *de novo* review). *See also Patton v. United States of America Rugby Football*, 381 Md. 627, 636 (2004).

A duty of care is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Prosser and Keeton on the Law of Torts*, § 53, at 356 (5th ed. 1984) (hereinafter "*Prosser*"). Although "[t]here is no set formula for this determination," *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 627 (1986), whether a duty is owed to a particular plaintiff turns on the "essential question—whether the

9

plaintiff's interests are entitled to legal protection against the defendant's conduct." *Prosser,* § 53, at 357.  In *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741 (1989), the Court of Appeals repeated the concept of duty it had expressed many decades before:

> [T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another.  It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury . . .  As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact, if there has been no breach of duty.

*Id*. at 751-52 (quoting *W. Va. Central R. Co. v. Fuller*, 96 Md. 652, 671-72 (1903)).

In *Jacques*, 307 Md. at 527, the Court of Appeals established principles to guide courts in assessing whether, in a negligence case, and in a particular context, a duty of care should be recognized. In *Jacques*, the plaintiff home buyers applied to the defendant bank for a mortgage loan.  They gave the bank a copy of their contract of sale, which included a financing contingency with a maximum interest rate, but provided that they would increase the amount of their down payment if that were necessary to qualify for a loan.  The bank breached the prevailing standard of care in evaluating the plaintiffs' qualifications for the mortgage they applied for, and, as a result, extended them a loan for significantly less money than they had sought. Because of the requirements of their contract, the plaintiffs had to obtain other financing for the balance of the purchase price.  That financing was at a higher interest rate, and to obtain it they incurred fees.

10

The plaintiffs sued the bank for negligence and prevailed in a jury trial.[5]  On appeal, the bank argued that the trial court should have entered judgment in its favor because it did not owe the plaintiffs a duty of care in tort.  The Court of Appeals disagreed, affirming the judgment. It observed that the sole risk of harm the plaintiffs faced by virtue of the bank's substandard loan processing was economic, *i.e.*, the loss of money in the form of a higher interest rate and payment of fees. (In fact, that is the risk that materialized.) In analyzing whether a duty of care should be recognized when the risk of injury is solely economic, the Court examined two seminal cases on third-party tort liability, authored many years ago by Judge Cardozo.

In *Glanzer v. Shepard*, 135 N.E. 275 (N.Y. 1922), a purchaser of beans sued a public weigher, alleging that the weigher's negligence had shortchanged him, causing him to lose money.  The weigher had been hired by the seller, not the purchaser.  The New York Court of Appeals held that the weigher owed a duty of care in tort to the purchaser, even though he was a stranger to the contract between the weigher and the seller, because the purchaser was a known and intended beneficiary of the contract.  In effect, although there was no contract between the purchaser and weigher, their relationship was equivalent to a contractual one.

---

[5]The plaintiffs were unsuccessful in other claims that were not at issue before the Court of Appeals.

11

In *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. 1931), the same court held that an accounting firm that negligently prepared a balance sheet for a corporation did not owe a duty of care in tort to a factoring company that lost money when it extended loans to the corporation in reliance upon the misinformation in the balance sheet. The Court explained that, unlike in *Glanzer*, there was no "contractual relation, or even one approaching it, at the root of any duty that was owing from the [accountant defendants]. . . to the indeterminate class of persons who. . . might deal with the [corporation] in reliance on the audit." 174 N.E. at 446.

From the holdings in *Glanzer* and *Ultramares*, the *Jacques* Court reasoned that the criteria most significant to whether a duty of care in tort should be recognized are "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." 307 Md. at 534.

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

307 Md. at 534-35 (footnote omitted). *See also Griesi v. Atlantic Gen. Hosp. Corp.*, 360 Md. 1, 12 (2000); *Iglesias v. Pentagon Title and Escrow, LLC,* 206 Md. App. 624, 638 (2012), *cert. denied*, 430 Md. 346 (2013). The Court further explained that

> an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed - thus justifying the imposition

12

of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent.

*Jacques*, at 537.

The Court held that because the nature of the risk to the plaintiffs from the bank's negligence was solely economic, a duty of care in tort would be recognized only if there was an "intimate nexus" (*i.e.*, contractual privity or its equivalent) between the two. In fact, the Court found such a nexus, based on the business relationship between the bank and the plaintiffs and certain express promises the bank had made to them. *Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270 (2006) (holding that in a tort action in which the only damages were economic, a sufficient intimate nexus was established between the parties to recognize a duty of care in tort); *Noble v. Bruce*, 349 Md. 730 (1998) (in absence of privity or its equivalent, attorney for testator did not owe a duty in tort to testamentary beneficiaries for economic loss occasioned by professional malpractice in will drafting and estate planning).

In the case at bar, CCA argues that under Maryland law, a contractor (or subcontractor) who performs repair or replacement work on a structure owes a duty, independent of its contract, to perform the work in accordance with the standard of care so as to protect property inside the structure from harm; and the scope of that duty covers property that is owned by a third party (*i.e.*, a person who is not the owner of the structure or a party to the roofing contract). Anticipating that Depaula and Roof Solutions will repeat

13

the arguments they made below, CCA also takes the position that the economic loss doctrine has no relevance to this case.

Depaula and Roof Solutions counter that such a contractor (or subcontractor) owes a duty of care only with respect to the personal property of the owner of the structure, who is a party to the roofing contract. A duty of care is not owed to a third party unless there is an "intimate nexus," in the form of contractual privity or its equivalent, between the contractor (or subcontractor) and the third party. They identify this principle as the "economic loss doctrine" based on the holding in *Jacques*, and assert that the harm that was suffered by CCA in this case was an economic loss. They explain that because CCA was a legal stranger to them, that is, it was not a party to the roofing contract or subcontract, "no duty of care was owed and there was no exception to the economic loss doctrine." Echoing the holding in *Ultramares v. Touche*, they maintain that concluding otherwise would give rise to tort liability to an "indeterminate class of plaintiffs," contrary to established Maryland law.

Although there has been some confusion in the nomenclature in Maryland appellate case law, the holding in *Jacques* and the "economic loss doctrine" are not one and the same. The economic loss doctrine, which developed in product liability cases, prohibits a plaintiff from recovering tort damages for what in fact is a breach of contract. So, a plaintiff in a product liability action alleging that a product is defective cannot recover tort damages for "the loss of value or use of the product itself, and the cost to repair or replace the product." *U.S. Gypsum v. Mayor and City Council of Baltimore*, 336 Md. 145, 156 (1994); *Pulte Home*

14

*Corp. v. Parex, Inc.*, 174 Md. App. 681, 737 (2007). *See Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E. 2d 288, 294 (Ill. App. Ct. 1999) ("tort law is not intended to compensate parties for monetary los[s]es suffered as a result of duties which are owed to them simply as a result of a contract."). *See also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986) (commenting that if the expansion of product liability law "were allowed to progress too far, contract law would drown in a sea of tort.").[6] As the Supreme Court's *East River* decision makes clear, the economic loss doctrine serves as a boundary between contract law, the purpose of which is to enforce the expectations of the parties to an agreement, and tort law, the purpose of which is to protect people and property from foreseeable risks of harm by imposing upon others a duty of reasonable care.

In the case at bar, the economic loss doctrine would be relevant if, for example, the new roof installed on Coe's townhouse was defective in a way that posed no risk to human safety, and Coe sued Roof Solutions and Depaula in tort to recover damages for the cost to repair the defect. That claim would sound in contract, and tort recovery would not be permitted. CCA does not allege that Depaula and Roof Solutions negligently constructed a defective roof, however. It alleges that, in carrying out the roof replacement work, they

---

[6]In the years since the Supreme Court's decision in *East River*, the economic loss doctrine has been expanded in some states, limited in others, and given way to "'vast confusion over this area of law.'" *David v. Hett*, 270 P.3d 1102, 1105 (Kan. 2011) (quoting Note, *Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud*, 84 Wash. U.L.Rev. 1513, 1513 (2006), and discussing at length the evolution of the doctrine).

15

carelessly used a torch so as to accidentally set fire to the roof of the townhouse.  That is a

tort claim to which the economic loss doctrine has no relevance. In *Pacific Indem. Co. v.*

*Whaley*, 560 F. Supp. 2d 425 (D. Md. 2008), where homeowners sued their roofing

subcontractor for negligently attempting to tarp and secure their roof in a major storm,

resulting in damage to about $800,000 in personal property inside the house, the court

explained that the economic loss doctrine was not pertinent:

> The Maryland Court of Appeals has explained the Economic Loss Doctrine as
> follows:  "It is generally said that a contractor's liability for economic loss is
> fixed by the terms of his contract. . .  Tort liability is in general limited to
> situations where the conduct of the builder causes an accident out of which
> physical harm occurs to some person or tangible thing other than the building
> itself that is under construction." [*Counsel of Co-Owners Atlantis Condo. Inc.
> v. Whiting-Turner Contracting Co.*, 308 Md. 18, 33 (1986)] ***Because the
> physical damage in the instant case was to "tangible things" other than the
> roof under construction - specifically the [homeowners'] property inside the
> house - the Economic Loss Doctrine does not preclude tort liability.***

*Id*. at 430 n.5 (emphasis added).[7]  In the instant case, the economic loss doctrine likewise has

no relevance to CCA's negligence claim.

In *Jacques* and cases decided since then, the Court of Appeals has emphasized that

central to the question whether a duty of care in tort should be recognized is the relationship

between the parties and the *nature of the risk of harm* created by the defendant's conduct --

not the harm that actually materialized.  In *Whiting-Turner*, 308 Md. at 18, the Court held

that a builder of a high rise condominium owed a duty of care in tort to condominium unit

---

[7]In *Whaley*, all the damaged personal property inside the house belonged to the homeowners.

16

owners, even though there was no privity of contract or the equivalent between them, because the defects in the building posed a fire hazard that created a risk of personal injury and death to the unit owners. The Court explained:

> [T]he determination of whether a [tort] duty will be imposed in this type of case should depend upon *the risk generated by the negligent conduct,* rather than upon the fortuitous circumstances of the nature of the resultant damage. Where the risk is of death or personal injury, the action will lie for recovery of the reasonable cost of correcting the dangerous condition.

*Id*. at 35 (footnote omitted).[8]

Here, the risk of harm created by Depaula's misuse of the torch in performing the roof replacement work was not solely economic loss. Indeed, it was not economic loss at all. It was personal injury and death and damage to personal property. *See, e.g., A. J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 251 (1994) (death of chickens inside commercial chicken houses caused by failure of an activation switch for emergency power source during a power outage was damage to tangible personal property, not intangible economic loss). Under *Jacques*, in this situation, contractual privity (or its equivalent) was not a prerequisite for the law to recognize a duty of care in tort. That is so notwithstanding that Roof Solutions and Depaula had a contractual relationship with Coe, to which CCA was not a party, and the

---

[8]In *Whiting-Turner*, the economic loss doctrine was relevant and played a part in the Court's analysis. The Court observed that, ordinarily, the economic loss doctrine would preclude recovery against the builder in tort for repairing or replacing the defects in its work. However, because the builder's substandard construction created a risk of personal injury, the doctrine would not bar the third party unit owners from recovering damages in tort from the builder for the cost to repair the defects so as to eliminate that risk.

negligent conduct occurred in the course of performing that contract. In *Whiting-Turner*, the Court of Appeals quoted with approval Dean Prosser's analysis of the movement in the law away from the notion that privity is required for a contracting party to be liable in tort for physical injury to the person or property of a third party sustained in the course of the contracting party's performing its contract:

> "[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct, which may be expected to affect the interests of another person.
>
> ***
>
> ***The requirement of privity of contract has been abandoned as a basis for recovery by third parties for physical harm to themselves and tangible things against those who negligently supply, repair, or construct things so as to leave them in an unreasonably dangerous condition."***

308 Md. at 27 (quoting *Prosser,* § 93, 667-68) (footnote in *Prosser* omitted by Court in *Whiting-Turner*) (emphasis added). The Court continued:

> "It is now the almost universal rule that the contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him *but also when the work is negligently done.* This applies not only to contractors doing original work, but also to those who make repairs . . ."

*Id.* at 28 (quoting *Prosser,* § 104A, at 723(emphasis added and footnotes omitted in *Whiting-Turner*)).

18

Because the risk of harm created by Depaula's careless use of a torch while replacing the townhouse roof was not solely economic, "foreseeability" is "the principal determinant" of whether a duty of care in tort should be recognized. *Jacques,* 307 Md. at 535. "The foreseeability test 'is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm.'" *Patton*, 381 Md. at 637 (quoting *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 348 (1995), in turn quoting, *Henley v. Prince George's Cnty.*, 305 Md. 320, 333 (1986)). As one treatise explains, "*Negligence entails an unreasonable risk of foreseeable harm*. . ."; an actor's conduct is not negligent unless "a reasonable person in a similar position would have foreseen that harm to someone's interests was an unreasonably likely outcome of [the actor's] conduct." Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* § 159, at 499 (2d. ed. 2011) (footnote omitted) (emphasis in original).

In addition to the "principal determinant" of foreseeability, other factors pertinent to whether a duty of care should be recognized when the risk of harm is not solely economic are

> "the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty of exercising care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Patton*, 381 Md. at 637 (quoting *Ashburn*, 306 Md. at 627 (citation omitted in *Patton*).

19

It was objectively evident that Depaula's careless use of the torch in performing the roof replacement work would cause the roof to catch fire, thereby creating a risk of personal injury, death, and property damage. Coe was not the only foreseeable subject of these risks. Any visitor in his townhouse when the fire broke out would have faced the same risk of personal injury and death he did. Likewise, the risk of damage to items inside the townhouse would not vary depending upon who owned them. Indeed, it was reasonably foreseeable that negligent conduct resulting in a fire on the townhouse roof could cause personal injury and death to people in adjacent townhouses, and to their personal property.

Although Depaula's negligence created a general risk of personal injury, death, and property damage, the risk of harm *specific to CCA* did not include personal injury or death. That would be so for any third party owner of property inside the townhouse (unless the third party was living there or happened to be present when the fire broke out). And obviously, a corporation or other business entity cannot sustain a personal injury and therefore never would face the risk of personal injury.

Citing *Marlboro Shirt Co. v. Am. Dis. Tel. Co.*, 196 Md. 565 (1951), Roof Solutions and Depaula argue that a tort duty of care should not be recognized when a contractor's breach of the standard of care creates a risk of harm that is limited to damage to property belonging to a third party. In *Marlboro Shirt*, a commercial property owner contracted with a sprinkler company to install a sprinkler system that included an alarm that would "signal a leakage of water in the sprinkler system to the office of the [sprinkler company]." *Id.* at

20

568. The property was rented to a shirt manufacturing company. Six years after the sprinkler system was installed, it developed a leak, but "[t]he alarm system failed to operate." *Id*. As a result, water from the sprinkler caused extensive damage to the shirt company's inventory and equipment. The shirt company sued the sprinkler company for breach of contract and negligence. The case was dismissed for failure to state a claim for which relief could be granted.

The Court of Appeals affirmed. Most of its discussion was devoted to the shirt company's (unsuccessful) argument that its breach of contract claim was viable because it was a third party beneficiary of the contract between the property owner and the sprinkler company. The following is the Court's entire discussion of the shirt company's negligence claim:

> As to the tort count, it has been held by this Court that a contractor owes no duty to the general public for which it may be made responsible in an action in tort for negligence, if it does not perform its contract. The duty under such contract is only to the one with which the contract is made.

*Id*. at 571-72.

*Marlboro Shirt* is inapposite. The tort claim there was premised upon the sprinkler company's having furnished a defective alarm system that simply did not work, not upon any failure on its part to take action when the leak occurred. It was not an accidental injury case. The defect in the sprinkler system did not create a risk of personal injury or death *to anyone.*

21

The sole risk of harm was damage to tangible items inside the building when the alarm malfunctioned.[9]

For the reasons we have explained, the risk of harm in the case at bar was not solely economic, and therefore foreseeability and the other relevant factors set forth in *Patton* guide our decision as to whether a duty of care should be recognized. Assessing those factors, we conclude that the fact that, for CCA, Depaula's negligence only created a risk of property damage, even though its negligence generally created a risk of personal injury and death as well, does not militate against recognizing a duty of care in tort to CCA. As already discussed, a reasonably prudent roofing contractor or subcontractor would know that accidentally setting fire to a roof in the course of replacing it would create a risk of personal injury and death, and of damage to tangible property, and that those risks are not targeted and confined to the owner of the structure that is being worked on.

In *Whaley*, *supra*, it was reasonably foreseeable to the roofing contractors that failing to properly tarp the roof to protect the house from an impending storm would result in damage to tangible personal property inside the house. It so happened that all of the items that were damaged belonged to the owners of the house. It was no less foreseeable, however,

---

[9]In some respects, *Whiting-Turner* is similar to *Marlboro Shirt* and, indeed, the builder in *Whiting-Turner* cited that case to support its argument that it did not owe a duty of care in tort to the unit owners. The Court of Appeals rejected the argument, commenting that the risk of harm in *Marlboro Shirt* did not include personal injury or death at all, and that the *Marlboro Shirt* Court's language concerning the tort claim was overly broad and unnecessary to its decision. 308 Md. at 29-30.

that their roofing contractors' negligence would result in damage to any tangible items in the house regardless of who they belonged to. The risk of harm, not the harm that actually materializes, is the touchstone of the duty analysis.

Moreover, in *Whaley* and in the case at bar, the conduct of the wrongdoer that produced a risk of personal injury and death to the owner of the structure undergoing the roof replacement, and damage to tangible personal property belonging to the owner of the structure, is the exact same wrongful conduct that produced the risk of personal injury and death to non-owners in or near the structure, and damage to tangible personal property belonging to non-owners in or near the structure. In both situations, the connection between the misconduct of the roofers and the risks of personal injury and death and of damage to tangible personal property was close. And the misconduct, being the same, carries the same moral blame, and implicates the same policy of preventing future harm.

Finally, the class of non-owners of a structure such as Coe's townhouse who are at risk of sustaining injury to their tangible personal property located inside the structure at the time of the negligence is neither "indeterminate," such as the class of persons who could rely to their economic detriment upon an error in an accountant's audit of a company, nor large; and it is readily identifiable. Accordingly, contractual privity or some other special relationship between the roofers and those third parties whose tangible personal property is located in or about the structure the roofers are working on is not necessary.

23

In the instant case, CCA was a member of a class of persons/entities owning tangible personal property inside the townhouse that Depaula and Roof Solutions were replacing the roof on. Therefore, Roof Solutions and Depaula's duty to exercise due care in performing the roofing work included protecting CCA from sustaining damage to its tangible personal property inside the townhouse. This duty of care does not depend upon the roofer having advance knowledge of the identity of each owner of tangible personal property inside the structure. Upon proof by CCA that its computers -- which are items of tangible personal property -- in fact were present when the roof caught fire; that the fire was caused by the negligence of Depaula/Roof Solutions; and that damage to the computers was proximately caused by the negligence, CCA may recover the reasonable cost to repair or replace the computers, in accordance with prevailing Maryland law on the proper measure of damages. *See e.g. Taylor v. King*, 241 Md. 50 (1965); *George's Radio & Television Co. v. Ins. Co. of N. Am.*, 549 F. Supp. 1014 (D. Md. 1982).

As we have discussed previously, CCA also seeks to recover for the damage to its software, in the form of the cost of repair or replacement and the time spent by its agents to make the repair or replacement; for loss of anticipated revenues; and for losses occasioned by the delay in implementation of its business plan. The foreseeability principle and related factors that support our conclusion that Depaula and Roof Solutions owed CCA, and the owners of any items of tangible property located in or about the townhouse, a duty of care to protect those items from being damaged by their negligence do not support a reasonable

24

conclusion that such a duty of care also pertains to the risk of harm to non-tangible personal property and economic loss consequential to injury to non-tangible personal property.

We first address the computer software. Although in a different context, the United States Court of Appeals for the Fourth Circuit has held that software installed on a computer hard drive is not tangible property. In *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89 (4th Cir. 2003), America Online ("AOL") sued its commercial general liability ("CGL") policy insurer seeking an order compelling it to defend it in a class action lawsuit brought by consumers alleging that the newest version of AOL software had damaged and rendered inoperable other software on the consumers' computers. Under the language of the CGL policy, the insurer was required to defend AOL in any lawsuit against it for "property damage"; and "property damage" was defined to mean "physical damage to tangible property of others, including all resulting loss of use of that property." *Id*. at 93-4. The insurer argued that damage to software is not physical damage to tangible property and therefore its duty to defend was not triggered.

The Fourth Circuit undertook an extensive analysis of the difference between computer "hardware," which is "concededly tangible property," and computer "software." *Id*. at 94. It first determined that "tangible property" is an unambiguous term meaning property "having physical substance apparent to the senses." *Id*. at 95. It then turned to the question whether software installed on a computer meets this definition. The court explained that "hardware" is the physical structure -- including magnetic disks, circuits, drives, and

25

electronic switches -- that allows a computer to store data. Software, in contrast, is a "set of instructions written by programmers and translated into binary code which is then transmitted to the computer through the electronic charges turning on some but not all switches and creating a configuration of on and off switches." *Id*. The court concluded that if the hardware were "physically scarred or scratched" in such a way as to prevent the computer from receiving these instructions and recording data, that would be damage to tangible property. *Id*. If the hardware were to remain functional but the "arrangement of the data and information stored on the hard drive were to become disordered or the instructions were to come into conflict with each another [sic], the physical capabilities and properties of the hard drive would not be affected." *Id*. It opined:

> Instructions to the computer and the data and information processed by it are abstract ideas in the minds of the programmer and the user. The switches and the magnetic disks are media, as would be paper and pencil. Loss of software or damage to software thus is not damage to the hardware but to the idea, its logic, and its consistency with other ideas and logic.
>
> * * *
>
> These instructions, data, and information are abstract and intangible, and damage to them is not physical damage to tangible property.

*Id*. at 95-96.

We are persuaded by the reasoning of *America Online* that software is not tangible personal property. As our foregoing discussion makes clear, the duty owed by Roof Solutions and Depaula was a duty to use reasonable care to prevent personal injury, death, and damage

26

to *tangible personal property*. The duty of care does not extend to preventing damage to CCA's proprietary software.

Loss or damage to "proprietary software" installed on computers owned by third parties and located within a structure on which roofers are working are not reasonably foreseeable. A roofer undertaking a roof replacement job for a homeowner reasonably should anticipate that substandard performance that could cause the roof to catch fire would injure tangible things inside the structure -- dishes, vases, furniture, computers, and the like -- regardless of who owns them. The tangible nature of these things makes them likely to be present inside a townhouse such as that owned by Coe, and, if the roofer undertakes a tour of the property in advance of the work, makes them capable of being observed. That same roofer would not reasonably expect, without having been given detailed, specific information in advance of the project, that the same misconduct would result in loss or damage to uniquely coded software invented by a third party owner of a computer located inside the structure.

We next address the claims of lost profits and damages from delay in implementing CCA's business plan. It follows from our discussion about CCA's software that a reasonably prudent roofer ordinarily would not anticipate that its negligence in performing roof replacement work, even negligence causing fire and water damage to the structure, would result in lost profits to the business of a third party that is dependent upon software located in a computer owned by the third party and located in the structure. These are not reasonably

27

foreseeable risks of harm, and therefore, ordinarily, the roofer's duty of care does not encompass them. The only exception, again, would be if the roofer were told very specifically, in advance, of the particular risk of harm, and had agreed that its undertaking would protect against that risk.

**(B)**

As mentioned previously, CCA argues that the circuit court erred by finding that there was no genuine dispute of material fact regarding the presence of its computers inside the townhouse at the time of the fire.

In Coe's affidavit and deposition testimony, he attested that when he and Chanturiya initially toured the townhouse, there were two computers sitting on the floor of the upstairs bedroom that Coe used for an office. Thus, the summary judgment record included evidence that two computers were inside the townhouse when the roof replacement work was being performed. Roof Solutions acknowledges this, but argues that the court's ruling nevertheless was correct because Coe's testimony about the presence of the computers will not be admissible at trial. Specifically, Roof Solutions maintains that if Coe offers this testimony, his purpose will be to alter the terms of their contract, and therefore the testimony would violate the parol evidence rule, and be inadmissible. Depaula generally asserts that the summary judgment record is devoid of evidence showing that CCA's property was inside Coe's townhouse before the fire (notwithstanding Coe's testimony).

At trial, Coe's testimony on behalf of CCA will be sufficient for CCA to prove that computer equipment belonging to it was present in Coe's townhouse when the roof replacement work began, and when the townhouse caught fire. There is no merit to the argument that this testimony will be precluded by the parol evidence rule. That rule has no application here. The testimony will not be offered to change the terms of the contract between Coe and Roof Solutions. Rather, it will be offered to show what items of tangible personal property belonging to CCA, *i.e.*, the two computers, were inside Coe's townhouse when the fire broke out. Accordingly, the circuit court erred in ruling that the summary judgment record did not include evidence that computers belonging to CCA were present in the townhouse at the relevant time.

Depaula also argues that the summary judgment record lacked evidence of any connection between CCA and Coe's townhouse. There *was* such evidence in the record.[10] As we have discussed, however, it is not necessary for there to be proof of a connection between CCA and Coe's townhouse for Roof Solutions and Depaula to owe CCA a duty of care in tort with respect to CCA's tangible property inside the townhouse. Nor is it necessary

---

[10] In his affidavit, Coe averred that this property had been "moved" to his home office in the townhouse prior to the fire; that before signing the contract with Roof Solutions he told Chanturiya that he kept this property in the townhouse on the second floor; and that Snyder and another CCA principal knew that the property was being stored in Coe's townhouse. CCA also attached as an exhibit to its opposition photographs taken three days after the fire depicting computers in the home office on the second story, surrounded by debris from the fire.

for CCA to show that, before undertaking the work, Roof Solutions or Depaula knew what items of tangible personal property were inside the townhouse, and to whom they belonged.

The court erred in finding that there was no genuine dispute of material fact between the parties about whether CCA's computers were inside the townhouse at the time of the fire. The presence of CCA's computers in the townhouse at the time of the fire was a material fact, even though whether Roof Solutions and/or Depaula knew the computers were there was not.

Finally, viewing the summary judgment record in the light most favorable to CCA, there was no evidence that Coe informed Roof Solutions, before it and Depaula undertook the roofing replacement work, that there was proprietary software belonging to CCA in the computers that Roof Solutions and Depaula would be expected to protect from harm.

## II.

### Causation

CCA contends the circuit court erred in granting summary judgment on the causation element of negligence because it overlooked that four expert witnesses causally linked the fire to Depaula's misuse of the blowtorch. These included the DCFD O&C investigation, the Firemark investigation, Michael Tracey (who testified that he agreed with the DCFD O&C investigation), and an expert retained by Roof Solutions.

Roof Solutions maintains that CCA waived any challenge to the court's causation ruling because it did not contest the causation argument advanced by Roof Solutions in its

30

motion for summary judgment. Alternatively, CCA did not produce any admissible evidence on the summary judgment record to prove causation. Roof Solutions asserts that the reports of DCFD, Firemark, and Morris were inadmissible hearsay that was not properly authenticated and that CCA did not disclose to the defendants the qualifications of any of the experts it identified or the factual bases and methodologies they used in arriving at their opinions. Roof Solutions also points out that Tracey testified in his deposition that it was not within his area of expertise to determine the cause of a fire; and that Tracey did not link the use by Roof Solutions of substrate material that was not thick enough to the fire. Indeed, Tracey opined that the substrate materials that were used were not the cause of the fire. Roof Solutions further argues that CCA failed to properly designate expert witnesses as required by the Maryland Rules and the court's scheduling order.

Depaula does not make any argument on the issue of causation. Roof Solutions asserts that, even if we recognize a duty of care in tort, we nevertheless should affirm the grant of summary judgment on the alternative ground stated by the circuit court -- the lack of admissible evidence of causation.[11]

---

[11]Roof Solutions states that CCA failed to preserve any challenge to the court's ruling on causation because it did not "fil[e] any written motion or argu[e] [this issue] orally before the Trial Court." It cites three out of state cases in support of its argument. There is no merit to this contention. CCA opposed the motions for summary judgment and, as we shall discuss, supported its opposition with admissible evidence showing that the fire was caused by a torch used by Depaula in the course of replacing the roof. CCA was not obligated to supplement this argument orally or to file a post-judgment motion to preserve for review its argument that the court erred by granting summary judgment on the basis of lack of
(continued...)

Roof Solutions did not argue in its motion for summary judgment that there was no admissible evidence that the fire was caused by Depaula's negligence. Rather it advanced several arguments that Depaula's negligence could not be attributed to it (Roof Solutions), for instance, because Depaula was an independent contractor. None of these arguments were addressed or decided by the circuit court in ruling on the summary judgment motions. The court granted summary judgment to Roof Solutions *and* Depaula "on the issue of causation," which appears to have been a ruling that the evidence was not legally sufficient to show that Depaula's conduct caused the fire that in turn caused the damage to CCA's property.

There was sufficient evidence on the summary judgment record to prove that Depaula's conduct was the cause in fact of the fire. The DCFD O&C report, which was attached to CCA's opposition to Roof Solutions' motion for summary judgment, was admissible evidence tending to show that the fire was started when a torch being used by Depaula's workers ignited the wooden structure of the roof. *See* Md. Rule 5-803(b)(8) (report by a public agency on "matters observed pursuant to a duty imposed by law, as to which matters there was a duty to report," admissible as an exception to the hearsay rule). CCA designated the authors of that report as expert witnesses and they were expected to

---

[11](...continued)
causation.

testify consistent with that report. Accordingly, the circuit court erred by granting summary

judgment in favor of Roof Solutions and Depaula on the issue of causation.[12]

                                     **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.**

---

[12]We shall not address the various grounds on which Roof Solutions argues that it cannot be held liable for Depaula's negligence, because none of them was the basis for the court's causation ruling. Ordinarily, on review of a decision granting summary judgment, we will not consider arguments that were advanced to the circuit court but were not the bases on which the court ruled.